**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| TRAVIS BODENHAMER, | : | MOTION TO VACATE |
| BOP No. 59300-019, | : | 28 U.S.C. § 2255 |
|     Movant, | : | |
| | : | CIVIL ACTION NO. |
|     v. | : | 1:10-CV-1859-JOF-ECS |
| | : | |
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION NO. |
|     Respondent. | : | 1:07-CR-148-4-JOF-ECS |

## FINAL REPORT AND RECOMMENDATION

Travis Bodenhamer is a federal inmate serving a 120-month sentence for drug-trafficking crimes. See [Doc. No. 161]. Proceeding through counsel, Mr. Bodenhamer has filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. See [Doc. No. 274]. Mr. Bodenhamer advances a single claim, namely, that his retained trial counsel provided "[I]neffective assistance . . . for advising [Mr.] Bodenhamer to plead guilty without raising a motion to suppress evidence." [Id. at 4]. Mr. Bodenhamer demands as relief that he "be re-sentenced without further hearing to 93 months." [Doc. No. 368 at 21].

### I.

### Preliminary Statement

After Mr. Bodenhamer was sentenced, but before he filed his § 2255 motion, the sentencing judge - the Honorable Beverly Martin - was appointed to the United States Court of Appeals for the Eleventh Circuit, and this case was reassigned to the Honorable J. Owen

Forrester.  <u>See</u> [Unnmbrd. Dkt. Entry dated Feb. 24, 2010].  On July 20, 2012, Judge Forrester referred Mr. Bodenhamer's later-filed § 2255 motion to the undersigned for an evidentiary hearing, and that hearing was held on March 11, 2013.  <u>See</u> [Doc. Nos. 343, 365, 366].  The matter has since been fully briefed by the parties and is ready for a Report and Recommendation.

## II.

## Factual Background.

**A.   Facts found on direct appeal.**

The Eleventh Circuit's decision denying Mr. Bodenhamer relief on direct appeal recites the following facts:

> In April 2007, Drug Enforcement Agency ("DEA") agents received information from a confidential source that members of a cocaine distribution organization that brought drugs from Mexico were looking for new distributors in the Atlanta area.  An undercover agent, posing as a cocaine dealer looking for a new supplier, met with members of the cocaine distribution organization and arranged for a shipment of cocaine to be delivered.
>
> After conducting surveillance of the cocaine shipment's delivery to Atlanta, agents stopped the vehicles of members of the cocaine distribution organization.  Inside one of the vehicles, agents found three suitcases containing 60 kilograms of cocaine.  DEA agents debriefed one of the members and learned that the cocaine had been transported from Texas by Defendant Bodenhamer, who had not yet been arrested.

<u>United States v. Bodenhamer</u>, 334 F. App'x 941, 942 (11th Cir. 2009) (per curiam).

2

B. **Findings of Fact.**

Having carefully considered the record and the testimony presented at the evidentiary hearing (and the parties' related filings), and having resolved the conflicts therein, I make the following additional findings of fact:

In April 2007, after the events described above by the Court of Appeals, three plain-clothes DEA agents approached Mr. Bodenhamer in a parking lot outside an insurance agency in Harlingen, Texas. [Doc. No. 366 at 12-13, 63].[1]  Mr. Bodenhamer, who had recently received threats from members of the drug distribution organization he was associated with, [T. 94; see also [Doc. No. 187 at 2], initially appeared to be nervous, [T. 85].  But, after the DEA agents identified themselves as government agents, [T. 12], Mr. Bodenhamer relaxed and appeared to be relieved, [T. 62, 67-68].

The DEA agents kept the conversation in public-view outside the insurance agency brief and asked Mr. Bodenhamer if "he would be willing to come with [them]" to answer questions about his trip to Atlanta. [T. 12-13, 63, 74, 77]. He agreed. [T. 22, 63]. The DEA agents did not display weapons, handcuff, or otherwise physically restrain Mr. Bodenhamer. [T. 22, 64, 67, 75]. Nor did the DEA agents tell Mr. Bodenhamer that he was required to accompany them.

---

[1]  References to the transcript of the March 4, 2013, evidentiary hearing will be cited hereinafter as "[T. page]."

3

[T. 22].  Mr. Bodenhamer now states that he felt he had no choice but to agree to the DEA agents' requests, but he did not tell this to the agents, or, later, to his retained criminal defense attorney. [T. 22-23, 41 ("Q. . . . [d]id you tell him that . . . you felt you weren't free to go?  A.  No . . . .")].

Mr. Bodenhamer and the DEA agents traveled in a green minivan to the Valley International Airport.  [T. 13].  There, Mr. Bodenhamer, the three DEA agents who had approached him in the parking lot, and two more DEA agents, entered the airport and went to a large room inside, where Mr. Bodenhamer was interviewed.  [T. at 63-64].  From time to time during the interview, Mr. Bodenhamer left the room to use the restroom or to take a smoke break.  [T. 13, 65-67].  At least one DEA agent accompanied him each time he left the room so that he would be able to re-enter the area where the interview room was, which was not open to public access.  [T. 13, 66-67, 78-79].  When Mr. Bodenhamer stated that he was hungry, the DEA agents brought pizza and soft drinks.  [T. 14, 27, 66].

After speaking with the DEA agents for several hours, Mr. Bodenhamer asked if he could call his wife.  [T. 13].  This request was initially declined, then later accommodated.  [T. 13, 27, 66, 69].  At no point during the interview, which Mr. Bodenhamer estimates lasted six to seven hours, did he ask to end the conversation or leave.  [T. 14, 87].  By the time he was

4

interviewed, Mr. Bodenhamer was deemed by the DEA to be a target of their investigation. [T. at 85].

The DEA agents told Mr. Bodenhamer that they would bring his truck, which was still parked at the insurance agency, to the airport where they were meeting. [T. 14]. After Mr. Bodenhamer's truck was brought to the airport, someone brought his briefcase, which was in the truck, inside, opened it, and took out Mr. Bodenhamer's calendar. [T. 16]. The DEA agents asked Mr. Bodenhamer to interpret the entries in the calendar. [T. 16]. Mr. Bodenhamer interpreted those entries, explaining that they reflected, among other things, his earlier deliveries of at least 235 kilograms of cocaine, over and above the 60 kilograms of cocaine mentioned above by the Court of Appeals that he admitted he had delivered in Atlanta. [T. 69].

Mr. Bodenhamer also advised the DEA agents that, at that time, he had drug proceeds and 71 additional kilograms of cocaine at his home, 50 kilograms of which were earmarked for future delivery to Atlanta and 21 kilograms of which were earmarked for future delivery to Grand Rapids, Michigan. [T. 65-66]. The DEA agents later traveled to Mr. Bodenhamer's home with him, where he pointed out the 71 kilograms of cocaine and the drug money, which the agents seized. [T. 70].

AO 72A
(Rev.8/82)

After speaking with the DEA agents, Mr. Bodenhamer left the airport and drove his truck home to make dinner and arrange care for his children. [T. 29]. He returned to the airport later that day, with his wife, to speak further with the DEA agents. [T. 27-29].

Ultimately, Mr. Bodenhamer agreed during these meetings to make controlled deliveries of the 71 kilograms of cocaine found at his home to Atlanta and Grand Rapids, as planned. [T. 70]. He completed those deliveries within the next week, i.e., later in April 2007. [T. 38]. Those controlled deliveries resulted in additional arrests by the DEA.

In June 2007, Mr. Bodenhamer (and four other men) were indicted on drug trafficking charges in the Northern District of Georgia. See [Doc. No. 1]. At that point – more than a month after meeting with the DEA agents in Harlingen, Texas, and after making the controlled deliveries of cocaine to Atlanta and Grand Rapids – Mr. Bodenhamer retained attorney Philip Hilder as his counsel. [T. 38].[2] Mr. Hilder is a Texas-based attorney, first admitted to practice in 1981, who served as an Assistant United States Attorney before joining the criminal defense bar. [T. 88]. Substantially all of Mr. Hilder's experience is in criminal law. [T. 88].

---

[2] Mr. Bodenhamer also retained local counsel in the Northern District of Georgia, whose performance and competence he has not challenged. See [Doc. No. 54].

6

Mr. Bodenhamer "told [Mr. Hilder] the details of what went on [the day he was approached by the DEA agents] and how everything happened." [T. 41]. As noted above, however, Mr. Bodenhamer never told Mr. Hilder that he did not feel free to leave his meeting with the DEA agents. [T. 23, 41-42].

It was clear to Mr. Hilder that Mr. Bodenhamer had cooperated with the agents from the beginning. [T. 89]. According to Mr. Hilder, "it was determined at that early juncture that suppression may not be viable." [T. 92]. Mr. Hilder recalled - and Mr. Bodenhamer did not dispute - that "it was determined that even had he been read his rights [under Miranda v. Arizona, 384 U.S. 436 (1966), in April 2007,] he would have agreed to cooperate because he felt it was in his best interest to do so." [T. 94]. Mr. Bodenhamer conceded that "throughout the case all major decisions were [his]." [T. 40].

Mr. Bodenhamer and his (now ex-)wife, Linda Rezende, later revisited with Mr. Hilder on several occasions the fact that Mr. Bodenhamer was never read his Miranda rights during the April 2007 meetings with the agents. [T. 50, 55-57]. According to Ms. Rezende, Mr. Hilder told Mr. Bodenhamer: "that is not going to help you, you need to focus on other things and move on." [T. at 56]. And, when Mr. Bodenhamer "kept challenging Mr. Hilder and asking him, you know, they never read me my rights" and "just wouldn't let

7

that go," "Mr. Hilder told him despite what you see [t]hat's depicted from television shows, that's not your case, it's not going to help you," and that they "needed to just drop it." [T. 56-57].

No suppression motion was filed within the time allowed by the Court for such motions in the pretrial order, see [Doc. No. 72], and, on August 16, 2007, the case was certified as ready for trial, see [Doc. No. 76]. Up until that time, Mr. Bodenhamer had continued to cooperate, and the government was seeking to continue with his cooperation. [T. 90-91]. Mr. Hilder advised Mr. Bodenhamer that his strategy should be to continue cooperation with the government in order to get the benefit of a "safety valve" provision under the Sentencing Guidelines that, if he qualified, could permit him to be sentenced to less than the mandatory minimum of ten years otherwise applicable to the drug charges against him. [T. 92-93]. In that regard, counsel told Mr. Bodenhamer "that it would be ill-advisable down the line to seek suppression because it [might] be held against him." [T. 92].

Some time later, the government told Mr. Bodenhamer that it would not offer him a cooperation agreement or recommend favorable treatment at sentencing based upon his cooperation. [T. 19-21, 94]. The government concluded that Mr. Bodenhamer had withheld information during his proffer sessions about his brother's drug dealing, which continued even after Mr. Bodenhamer was

8

"cooperating," and that government doubted Mr. Bodenhamer's truthfulness and had concluded that his utility as a cooperating source or potential witness was compromised. See [Doc. No. 187 at 5-8].[3]   At that point, Mr. Bodenhamer and Mr. Hilder "met to determine what were the next steps[:] to stay the course or to move for suppression." [T. 95].

According to Mr. Hilder, Mr. Bodenhamer decided to "stay the course because suppression would have only gotten [him] part way there" in terms of a reduced sentence, and "it was determined at the second time that we addressed suppression that he was not going to prevail on a suppression issue, and that strategically it would still be in the best interest to go forward . . . pleading to the indictment and arguing for a variance and/or 5K2 downward departure." [T. 95-96]. Mr. Hilder explained that in his judgment "it would have undercut" the strategy of seeking sentencing leniency from the Court in the form of a downward departure or variance to have filed a belated motion to suppress. [T. 118].

Mr. Hilder also noted that the case had already been certified as ready for trial. Thus, permission from the Court to file an out-

---

[3]   The reasons that the government declined to offer a cooperation agreement (or, ultimately, a favorable sentencing recommendation) to Mr. Bodenhamer were not addressed at the evidentiary hearing. These issues were, however, discussed at the sentencing hearing. See [Doc. No. 187 at 5-8]

of-time suppression motion would have been required, and it was uncertain whether it would be allowed. [T. 117-18]. According to counsel, the strategic choice that Mr. Bodenhamer made was to "show[] the Court good faith that Mr. Bodenhamer had cooperated and was consistent in his position all along starting in April of 2007." [T. 120]. Indeed, Mr. Hilder continued to make Mr. Bodenhamer available to cooperate and testify at trial, but the government did not use him. [T. 120-21]. Counsel also concluded that it was a very unlikely that Mr. Bodenhamer would win a suppression motion and so advised Mr. Bodenhamer. [T. 118]. Mr. Hilder testified that, in his judgment and experience, it would have been highly unlikely that Mr. Bodenhamer would have received acceptance of responsibility or a safety valve if he had filed a belated motion to suppress. [T. 119]

Mr. Bodenhamer ultimately entered a non-negotiated guilty plea in February 2008. See [Doc. No. 110]. At the sentencing hearing in June 2008, the government argued that the drug quantity appropriately attributed to Mr. Bodenhamer should include not only the 60 kilograms of cocaine he had initially delivered to Atlanta, but also the 235 kilograms of cocaine recorded in his ledger as having been previously distributed. Judge Martin agreed with the government on the drug amounts, [Doc. No. 187 at 27], and the

10

Eleventh Circuit affirmed this finding on appeal, <u>Bodenhamer</u>, 334 F. App'x at 943-44.

At the same time, Judge Martin proved receptive to Mr. Hilder's argument that Mr. Bodenhamer should benefit from his "cooperation" with the government. Over the government's objection, she found: "In light of Mr. Bodenhamer's immediate disclosures to the agents that came to his house in terms of handing over the ledger, allowing the search, turning over the $65,000, and doing the two controlled deliveries, I find he has met the requirements of the 'tell-all' provision," and she awarded Mr. Bodenhamer safety-valve status under U.S.S.G. § 5C1.2, resulting in a two-point reduction in his offense level. [Doc. No. 187 at 14-15, 28]. Judge Martin also awarded Mr. Bodenhamer a three-point reduction for acceptance of responsibility. [<u>Id.</u> at 28]. Judge Martin then concluded that the advisory guideline sentencing range was 135-168 months. [<u>Id.</u>].

The government requested that Mr. Bodenhamer be sentenced within the guidelines. [<u>Id.</u> at 31]. Judge Martin, however, departed downward pursuant to 18 U.S.C. § 3553, and imposed a 120-month sentence on Mr. Bodenhamer, fifteen months below the lower guidelines limit. [<u>Id.</u> at 32]. In arriving at the 120-month sentence, Judge Martin specifically noted that she considered "the need to avoid sentencing disparities" and that a 120-month sentence would place Mr. Bodenhamer appropriately in relation to other

members of the same criminal conspiracy, including one who had more fully cooperated with the government than had Mr. Bodenhamer. [Id. at 32].

### III.

### Discussion and Findings

In light of the above facts, I now turn to the legal issues:

**A.   Ineffective Assistance of Counsel**

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court announced a two-part standard for ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 2064. A movant under § 2255 claiming ineffective assistance of counsel bears the burden of demonstrating both prongs of the Strickland test.   Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004).

The Strickland test applies to challenges made to guilty pleas, as well as to convictions after a trial. Hill v. Lockhart, 474 U.S. 52 (1985).   In the guilty plea context, the first prong of Strickland requires the defendant to show that his plea was not

12

voluntary because he received advice from counsel that was not "within the range of competence demanded of attorneys in criminal cases." <u>Id.</u> at 56 (quotation marks and citation omitted). The second prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process," meaning the defendant must show "a reasonable probability that, but for counsel's errors," he would not have pled guilty and would have gone to trial, or would have entered a different plea. <u>Id.</u> at 59 (stating the test in the context of an accepted guilty plea); <u>see also Diaz v. United States</u>, 930 F.2d 832, 835 (11th Cir. 1991) (applying the test to a rejected plea agreement).

Mr. Bodenhamer bears the burden of demonstrating "that counsel's performance was deficient, and that the deficiency prejudiced the defense." <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003). And "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that [it] cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686. As the Eleventh Circuit has summed up this test: "[T]he cases in which habeas petitioners can properly prevail are few and far between" and require showing that counsel acted in a way that no competent counsel would have acted. <u>Chandler v. United States</u>, 218 F.3d 1305, 1312-13 (11th Cir. 2000) (en banc).

The undersigned concludes that Mr. Bodenhamer has failed to carry his burden of showing that counsel's conduct was deficient. Simply put, the advice given to Mr. Bodenhamer not to file a motion to suppress, and the concomitant failure to file, were not outside the range of professional competence required of criminal attorneys. As Mr. Bodenhamer's criminal defense counsel noted, the advice given was part and parcel of a strategy aimed at maximizing the possibility of a lenient sentence by presenting Mr. Bodenhamer to the Court as a defendant who had been extraordinarily cooperative with the government from the outset and who had been unjustifiably punished when the government withheld a cooperation agreement that would have led to credit being given for that cooperation. Counsel's belief was reasonable that filing a belated suppression motion, after the deadline for filing such motions had passed and after the case had been certified ready for trial, could have had the effect of undermining this strategy. See [T. 118]. Stated another way, it was a reasonable judgment for counsel to have made that the benefits of maintaining "super-cooperator" status before the trial judge outweighed the theoretical, but unlikely, benefit of a successful motion to suppress, especially where an unsuccessful motion could have had a negative effect at sentencing.[4]

---

[4] See Part III.B, infra, discussing why it is highly unlikely that a motion to suppress would have been granted.

14

Hindsight suggests not only that the strategy was a reasonable one, well within the range of competent assistance, but also that it was, in fact, successful. At sentencing, Judge Martin credited Mr. Bodenhamer for "volunteer[ing] information about his participation in crimes" even though "that was not subject to any cooperation agreement with the government; he just did it." [Doc. No. 187 at 3]. Judge Martin chided the government for its efforts to "penalize him for [the information in the ledger], but yet not give him credit for cooperating and the safety valve." [Id. at 4]. And Judge Martin relied on Mr. Bodenhamer's unbroken and consistent "cooperation" in determining that he deserved an adjustment to his criminal offense level under the safety-valve provision of the Sentencing Guidelines. See [T. 14-15 ("In light of Mr. Bodenhamer's immediate disclosures to the agents . . . in terms of handing over the ledger, allowing the search, turning over the $65,000, and doing the two-controlled deliveries, I find he has met the requirements . . . .")]. It was not outside the range of competent assistance for counsel to believe that, had Mr. Bodenhamer aggressively (and belatedly) moved to suppress the ledger and his oral statements, the factual predicate for granting safety-valve status would have been undermined.

It is equally clear that the strategic decision not to file a belated suppression motion was reasonable from the perspective of

counsel at the time the decision was made.  See Strickland, 466 U.S. at 689 (requiring courts to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").  District judges exercise broad discretion in criminal sentencing, and the sentences they impose are generally subject only to deferential review for abuse of that discretion.  See Gall v. United States, 552 U.S. 38 (2007).  Certain decisions by district judges – e.g., the determination of whether a defendant is entitled to sentencing credit for acceptance of responsibility -- are "entitled to great deference on review" because the "sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility."  U.S.S.G. §3E1.1, App. Note 6.  And, specifically, "a defendant who . . . frivolously contests[] relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." Id. at App. Note 1(A).

     After Mr. Hilder correctly acknowledged that filing a motion to suppress the ledger and Mr. Bodenhamer's statements might not necessarily have prevented him from still being given credit for acceptance of responsibility, Mr. Hilder also correctly noted that it might have jeopardized his receipt of that credit.  Mr. Bodenhamer cites United States v. Rodriquez, 959 F.2d 193, 197 (11th Cir. 1992), for the proposition that "Section 3E1.1 does not allow

16

the judge to weigh against the defendant the defendant's exercise of constitutional or statutory rights." See [Doc. No. 368 at 18].  Mr. Bodenhamer suggests that this means that there was no risk to Mr. Bodenhamer in filing a belated motion to suppress, even if that motion were (as the undersigned concludes it would have been) denied.   But in the sentence that immediately follows Mr. Bodenhamer's block-quote, the same Eleventh Circuit panel wrote: "The exercise of these rights may diminish the defendant's chances of being granted the two level reduction [for acceptance of responsibility], not because it is weighed against him, but because it is likely that there is less evidence of acceptance to weigh in his favor." Rodriquez, 959 F.2d at 197.

It was not unreasonable for Mr. Hilder to conclude that Judge Martin might react differently had Mr. Bodenhamer filed a suppression motion *after* his case was certified for trial (and without any further cooperation) than to reward Mr. Bodenhamer based on a consistent and unbroken record of "super cooperation." [T. 119].  Such changed circumstances might have prompted less favorable treatment at sentencing.

To the extent that Mr. Bodenhamer now asserts that, had he been advised differently and given the option of filing a motion, he would not have pled guilty and would have pursued the suppression motion, see [Doc. No. 274-1 at 2, 9, 14], he would unquestionably

17

have been risking a "pretty significant [negative] difference" in his ultimate sentence, if the motion were denied and he was found (or pled) guilty thereafter. See, e.g., Alabama v. Smith, 490 U.S. 794, 803 (1989) ("there is no basis for a presumption of vindictiveness where a second sentence imposed after a trial is heavier than a first sentence imposed after a guilty plea"). He certainly would have been no better off in that eventuality. There could be no guarantee that Judge Martin would necessarily have been so lenient after the filing of what might have been viewed as a frivolous motion contesting relevant conduct. See U.S.S.G. §3E1.1, App. Note 1(A).

To the extent that Mr. Bodenhamer has not expressly asserted in this case that he would have filed a motion to suppress and insisted on going to trial rather than proceeding with his guilty plea, then he has failed to meet the standard for showing ineffective assistance of counsel in the plea context. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," or at least would have entered a different (and more favorable) plea. Hill v. Lockhart, 474 U.S. at 59.

As far as a different plea is concerned, Mr. Bodenhamer appears to argue that the Court can take as proven that he would not have

18

entered a plea when he did, but instead would have obtained leave to file and would have filed a successful motion to suppress, after which he would then have entered a non-negotiated plea, subject to the same mandatory minimum of 120 months, but would have received a sentence of 93 months, 15 months less than the new guidelines range and 27 months less than the mandatory minimum, computed without counting the 235 kilos of cocaine shown in his ledger-calendar, and, further, with the benefit of both the safety valve and acceptance of responsibility.   But the evidence at several links in the causal chain fails to support such a conclusion.   At best, the likelihood of this result would be speculative.

Mr. Hilder offered reasonable professional assistance in advising that Mr. Bodenhamer could best position himself to request lenience at sentencing by presenting a consistent, unbroken record as a "super cooperator."   [T. 120].   And, from all that appears in the record, Mr. Bodenhamer received credit for his "cooperation" from Judge Martin and as lenient a sentence as she was willing to impose, considering Mr. Bodenhamer's culpability in relation to his codefendants.   See [Doc. No. 187 at 32 (noting that a sentence of 120-months was chosen "specifically . . . to avoid sentencing disparities").   The strategy that Mr. Hilder advised cannot be said to be one that "no competent counsel would have taken."   Chandler, 218 F.3d at 1315.

19

In the absence of a showing both that Mr. Hilder's performance was deficient and that Mr. Bodenhamer was prejudiced by any such deficiency, Mr. Bodenhamer has failed to meet his burden of showing ineffective assistance of counsel.

**B.**   **The Unfiled Motion to Suppress Evidence**

The foregoing discussion of Mr. Bodenhamer's ineffective assistance of counsel claim assumed for the sake of discussion that Mr. Bodenhamer could have prevailed on his a motion to suppress, for if he would not have, then he suffered no prejudice from the failure to file that motion.  For the following reasons, the undersigned concludes that any motion to suppress filed by Mr. Bodenhamer would very likely have been denied.  This further supports the conclusion that Mr. Bodenhamer did not receive ineffective assistance of counsel.

1.   <u>The Fifth Amendment Claim.</u>

"The Fifth Amendment provides to every person a right against self-incrimination, and, correspondingly, requires that trial courts exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and obtain counsel." <u>United States v. Luna-Encinas</u>, 603 F.3d 876, 880 (11th Cir. 2010) (internal citation omitted).  The entitlement to such warnings, however, only arises "when custodial interrogation

begins." United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004).

Custody involves the deprivation of "freedom of action in any significant way." Miranda, 384 U.S. at 444. "Even if a person has not been arrested, advice of Miranda rights is required if there is a restraint on freedom of movement 'of the degree associated with a formal arrest.'" United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)); see also United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006). "[T]he initial determination of custody depends on the objective circumstances of the interrogation . . . ." Stansbury v. California, 511 U.S. 318, 323 (1994). When questioning takes place in surroundings familiar to the Defendant, courts are less likely to find that the defendant was in custody. See Beckwith v. United States, 425 U.S. 341, 345-47 (1976) (Miranda warnings not required where IRS interviewed taxpayer at his home). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

"[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that

'degree associated with a formal arrest' to such extent that he would not feel free to leave." Muegge, 225 F.3d at 1270 (quoting United States v. Phillips, 812 F.3d 1355, 1360 (11th Cir. 1987 (internal quotation marks and citations omitted)). "And, under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citing Florida v. Bostick, 501 U.S. 429, 437-38 (1991)).

The Supreme Court has recently described the inquiry into when an individual is "in custody" as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted)).

Various factors that are relevant include: (1) "whether officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance . . . could be compelled," United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006);

22

(2) the location of detention, <u>United States v. Brown</u>, 441 F.3d 1330, 1348 (11th Cir. 2006); (3) the length of detention, <u>United States v. Medina-Villa</u>, 567 F.3d 507 (9th Cir. 2009); and (4) whether the defendant sought to leave or indicated he did not wish to comply with any requests, <u>United States v. Phillips</u>, 812 F.2d 1355, 1362 (11th Cir. 1987).

In the circumstances of this case as presented at the evidentiary hearing on the § 2255 motion, the undersigned would not have recommended suppression of any of the statements Mr. Bodenhamer made when he was interviewed at the airport in April 2007 because he was not "in custody" and <u>Miranda</u> warnings were not required. Mr. Bodenhamer was approached in a public area and asked to accompany the DEA agents to a location away from the insurance agency parking lot to talk to them about his trip to Atlanta; he was not ordered to do so; he was not placed under formal arrest; he was not handcuffed or restrained; and there was no indication given that his refusal would be compelled. The location of the interview was not a police station, but was at an airport - a relatively neutral venue. Mr. Bodenhamer never asked to leave or indicated that he did not wish to comply with any of the agents' requests. After some initial reluctance, he fully cooperated in answering the agents' questions. Indeed, his cooperation went so far as disclosing the existence of additional previously unknown quantities of drugs and drug proceeds

23

being stored at his home and then accompanying the agents to his house to point out the drugs and money so that the DEA agents could seize them.  [T. 70-71].  Mr. Bodenhamer was allowed to leave the airport after the initial round of interviews, and he later returned the same day, with his wife, to continue to conversations.  After the first interviews were concluded he was again allowed to leave, and he agreed to cooperate further by making controlled deliveries of drugs in Atlanta and Grand Rapids.  Considering the totality of these circumstances, the undersigned concludes that Mr. Bodenhamer would not have been adjudged on a motion to suppress to have been in custody such that <u>Miranda</u> warnings were required to have been given. No Fifth Amendment violation occurred and a motion to suppress these statements would have been denied.

        2.   <u>The Fourth Amendment Claim.</u>

        Mr. Bodenhamer also asserts that his Fourth Amendment rights were violated when the DEA agents retrieved his truck from the insurance agency parking lot and brought it to the airport, retrieved his briefcase from the truck and brought it into the airport interview room, and there opened the briefcase and removed the ledger, which Mr. Bodenhamer then explained to the agents.  Mr. Bodenhamer asserts that a motion to suppress the ledger would have been granted and that the evidence obtained from the ledger

24

(including the evidence of other cocaine deliveries involving 235 additional kilos) would have been excluded.

The retrieval of the truck and the seizure of the briefcase were undisputedly conducted without a warrant. In general, warrantless searches and seizures are per se unreasonable under the Fourth Amendment.[5] See, e.g., Katz v. United States, 389 U.S. 347, 357 (1967). There are, however, well-recognized exceptions to the warrant requirement. See, e.g., Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013). One exception is consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.'" Ohio v. Robinette, 519 U.S. 33, 40 (1996) (quoting Schneckloth, 412 U.S. at 248-49)).

At the hearing on Mr. Bodenhamer's § 2255 motion, the factual circumstances surrounding the retrieval of the truck and the briefcase with the ledger were not fully developed. The DEA agent who testified was not sure exactly how the briefcase with the ledger

---

[5] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

turned up inside the airport interview room.  [T. 80].  The DEA agent who retrieved the vehicle did not testify, nor did any other DEA agent relate how the ledger came to be at the airport.  Mr. Bodenhamer testified only that he was told the agents brought his truck to the airport and - conclusorily - that he did not consent to a search of his vehicle.  [T. 14-15].

Law enforcement officers may conduct a search without a warrant based upon an individual's voluntary consent, and evidence discovered and seized during such a search may be admitted at trial. Schneckloth, 412 U.S. at 219.  Consent may be express or implied, and need not necessarily be knowing and intelligent.  Id. at 241.[6] In order for consent to be deemed voluntary, it "must be the product of an essentially free and unconstrained choice."  United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)).  "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."  Florida v. Royer, 460 U.S. 491, 497 (1983); accord Schneckloth, 412 U.S. at

---

[6]     Knowledge of the right to refuse consent, however, is one factor to consider in evaluating voluntariness.  Schneckloth, 412 U.S. at 227.

233-34; <u>Zapata</u>, 180 F.3d at 1241; <u>United States v. Edmondson</u>, 791 F.2d 1512, 1515 (11th Cir. 1986).

Although Mr. Bodenhamer conclusorily testified that he did not consent to a search of his vehicle and seizure of the briefcase, consent to a search and seizure may nonetheless be implied by (1) the circumstances surrounding the search, <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 752 (11th Cir. 2002); (2) the person's prior actions or agreements, <u>United States v. Peterson</u>, 100 F.3d 7, 11 (2d Cir. 1996); or (3) the person's failure to object to the search, <u>United States v. Dunkley</u>, 911 F.2d 522, 525-26 (11th Cir. 1990). In this case, each of these factors supports a finding that Mr. Bodenhamer impliedly consented.

First, Mr. Bodenhamer conceded at the evidentiary hearing on his § 2255 motion that the DEA agents told him they were bringing his truck from the insurance agency parking lot to the airport. [T. 14]. Second, Mr. Bodenhamer had by that time already agreed to speak with the DEA agents and provide information relating to his drug trafficking activities. He was fully cooperating, and he told them at some point about other drug deliveries he had made and that he had a drug ledger that he was keeping that would indicate dates of trips and amounts of drugs, as well as drugs and currency at his home. [T. 65-66, 68]. Third, there was no testimony that Mr. Bodenhamer objected when told the DEA agents were bringing his truck

27

to the airport, when they brought his briefcase in, or when they produced the drug ledger and asked him to explain it. And, subsequently, Mr. Bodenhamer apparently freely and voluntarily explained the entries in the ledger so the agents could understand them.

It further appears that Mr. Bodenhamer's consent to the search was voluntarily given. Whether or not voluntary consent has been given is a question of fact also determined by examining the totality of the circumstances. Schneckloth, 412 U.S. at 226-27; United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996), overruled on other grounds by Arizona v. Gant, 556 U.S. 332 (2009); Tukes v. Dugger, 911 F.2d 508, 517-18 (11th Cir. 1990). Various factors may be considered in determining whether consent is voluntary, including: (1) an individual's knowledge of the right to refuse consent; (2) his or her youth, intelligence, lack of education, and language ability; (3) the degree to which the defendant cooperates with the police; (4) the defendant's attitude about the likelihood of discovery of illegal substances; and (5) the length of detention and the nature in which the defendant is questioned, including physical punishment or other coercive police behavior. Schneckloth, 412 U.S. at 226; United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001); United States v. Butler, 102

28

F.3d 1191, 1197 (11th Cir. 1997).  These factors weigh in favor of a finding that Mr. Bodenhamer voluntarily consented to a search.

In addition to consent, another recognized exception to the warrant requirement applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable.  <u>Kentucky v. King</u>, 131 S. Ct. 1849, 1856 (2011).  One such exigency arises where there is danger of imminent destruction of evidence.  <u>Cupp v. Murphy</u>, 412 U.S. 291, 294-96 (1973).  "[E]xigency . . . must be determined case by case based on the totality of the circumstances."  <u>McNeely</u>, 133 S. Ct. at 1556. In narcotics cases, where evidence can be rapidly destroyed, exigent circumstances often arise where there is a significant risk that evidence may be destroyed before a warrant can be obtained because a person has been alerted that government agents suspect him of criminal behavior.  <u>United States v. Newsome</u>, 475 F.3d 1221, 1226-27 (11th Cir. 2007); <u>United States v. Mikell</u>, 102 F.3d 470, 476 (11th Cir. 1996).  <u>See also</u> <u>Brigham City v. Stewart</u>, 547 U.S. 398, 403 (2006) ("law enforcement officers may make a warrantless entry onto private property . . . to prevent the imminent destruction of evidence") (citing <u>Ker v. California</u>, 374 U.S. 23, 40 (1963)); <u>Illinois v. McArthur</u>, 531 U.S. 326, 331 (2001) (concluding that a warrantless seizure of a person to prevent him from returning to his

29

trailer to destroy hidden contraband was reasonable due to exigency).

In this case, the DEA agents' contact with Mr. Bodenhamer alerted him to the government's investigation. The information Mr. Bodenhamer voluntarily provided established probable cause for the agents to believe that the truck in which he had transported drugs and drug proceeds to and from Atlanta would contain additional evidence of his drug trafficking activity, namely the ledger that Mr. Bodenhamer had told him about. Even though Mr. Bodenhamer was with the agents, there still existed a legitimate risk that any evidence then in the truck might be removed or destroyed before it was possible to obtain a search warrant, especially once Mr. Bodenhamer left the interview room and departed in his truck.

The fact that the evidence was in his truck, a mobile vehicle, would also add an additional element of exigency and another possible justification for search without a warrant. Under the "automobile exception" to the warrant requirement, the police are authorized to conduct a warrantless search of a vehicle if "(1) the vehicle is readily mobile; and (2) the police have probable cause for the search." United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007). The mobility requirement "is satisfied merely if the automobile is operational." Id. (quotation marks and citation omitted). Probable cause to search a vehicle "exists when under the

totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." Id. (quotation marks and citation omitted).

In this case, after Mr. Bodenhamer told the agents about the ledger and about his recent drug trafficking activities utilizing the truck, the DEA agents pretty clearly would have had probable cause to search the vehicle, including the briefcase, under the automobile exception. See California v. Acevedo, 500 U.S. 565, 579-580 (1991) (if the police have probable cause to search an entire vehicle, they may search all compartments, containers, and packages within the vehicle); see also United States v. Ross, 456 U.S. 798, 820-821 (1982) (same).

In sum, based on the totality of the circumstances as revealed by the evidence presented to the Court at the hearing on Mr. Bodenhamer's § 2255 motion, and for the reasons explained above, I find that it would have been highly unlikely that a motion to suppress either Mr. Bodenhamer's (1) oral statements to the DEA agents or (2) drug ledger would have been granted.

31

## IV.

### Recommendations

**A.    The Section 2255 Motion.**

Having carefully considered the testimony and evidence offered at the hearing, together with the parties' pre- and post-hearing briefs and the record in this case as a whole, I conclude that Mr. Bodenhamer's retained counsel was not deficient in advising against the filing of a motion to suppress and in not filing such a motion. In other words, I cannot conclude on this record that Mr. Bodenhamer's retained counsel rendered ineffective assistance warranting relief.   Further, even if counsel had filed a motion to suppress, the motion would not likely have been successful.   And, finally, I find that Mr. Bodenhamer has not shown that, but for any of his counsel's alleged errors, he would not have pleaded guilty and been sentenced as he was, but would have received a lesser sentence upon entering a later plea.   Thus, I **RECOMMEND** that Mr. Bodenhamer's § 2255 motion [Doc. No. 274] be **DENIED**.

**B.    Certificate of Appealability.**

In a § 2255 proceeding, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   28 U.S.C. foll. § 2255, Rule 11(a).   A § 2255 movant "cannot take an appeal unless a circuit justice or a circuit

32

or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, a § 2255 movant must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003) (citations and quotation marks omitted). Mr. Bodenhamer has not demonstrated that he has been denied a constitutional right or that the issue is reasonably debatable. Accordingly, I **RECOMMEND** that a Certificate of Appealability be **DENIED**.

The Clerk is **DIRECTED** to terminate the referral of this case to the undersigned.

**SO RECOMMENDED AND DIRECTED**, this 15th day of January, 2014.


*<u>S/ E. Clayton Scofield III</u>*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE


33